UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

CYNTHIA KUDJI SYLVESTER

VERSUS

LOUISIANA STATE UNIVERSITY
AGRICULTURAL & MECHANICAL
COLLEGE BOARD OF SUPERVISORS

CASE NO.  6:24-CV-01114

JUDGE ROBERT R. SUMMERHAYS

MAGISTRATE JUDGE DAVID J. AYO

## MEMORANDUM RULING

The present matter before the Court is a Motion for Summary Judgment filed by Defendant,

the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

("LSU") [ECF No. 15]. Plaintiff Cynthia Sylvester has opposed the Motion,[1] and LSU has filed a

Reply.[2] After reviewing the parties' arguments, the summary judgment record, and the relevant

authorities, the Court GRANTS the Motion in part and DENIES the Motion in part.

**I.**
**BACKGROUND**

Dr. Cynthia Sylvester enrolled in LSU Health Science Center's Lafayette Family

Residency Program beginning in January 2020.[3] LSU points to evidence in the summary judgment

record that, during her first year of residency, Sylvester "exhibited performance below her peer

average in 33 of 55 competency areas."[4] According to LSU, Sylvester's performance deteriorated

during her second year of residency and she was required to repeat her second year. LSU alleges

that Sylvester exhibited "below peer average performance in 28 of 28 areas of competency in her

---

[1] ECF No. 23.
[2] ECF No. 25.
[3] ECF No. 1 at 2.
[4] ECF No. 15-1 at 1 (citing ECF Nos. 15-4; 15-12; 16).

1

second year."[5] LSU also points to a series of performance reviews documenting performance related problems in Sylvester's work during the second year of her residency. July 22, 2021, "Dr. Jay Jaikishen, Faculty over the Internal Medicine Rotation, evaluated Dr. Kudji-Sylvester and found numerous instances of sub-standard performance by Dr. Kudji-Sylvester."[6] As a result, Sylvester failed her Internal Medicine rotation.[7]

In a November 13, 2021 evaluation, a member of the OB Faculty, Dr. Frank Caillet, noted in a review that Sylvester "lacks basic knowledge in managing obstetric patients on an inpatient service, among other noted deficiencies."[8] On November 18, 2021, Dr. Jimmy Skrasek, a third year "Resident Preceptor" overseeing the OB rotation, wrote a letter to the director of the family medicine resident program, Dr. Marilyn Marshall, identifying a list of performance and professionalism problems that he witnessed.[9] Sylvester subsequently met with Dr. Marshall and Dr. Alan Broussard (the Associate Program Director) to discuss Sylvester's "academic and clinical performance issues," and to develop an "Individualized Learning Plan" for Sylvester.[10] In February 2022, Marshall informed Sylvester that she would not be promoted to her third year of residency and that she would have to repeat her second year because her performance had not improved.[11] The summary judgment record also includes documentation of unexcused absences that resulted in a letter of reprimand and complaints from Sylvester's patients.[12]

---

[5] ECF No. 15-1 at 1.
[6] *Id.* (citing ECF No. 15-5).
[7] *Id.*
[8] *Id.* at 2 (citing ECF No. 15-6).
[9] *Id.* (citing ECF No. 15-7).
[10] *Id.* (citing ECF No. 15-8).
[11] *Id.* (citing ECF No. 15-9); ECF No. 15-14 (February 23, 2022, Letter from Marshall to Oge stating that Sylvester "has exhibited global deficiencies in all of the ACGME competency areas.")
[12] ECF 15-17 at 8, 29.

In May 2023, Dr. Holly Provost, the Section Chief of Gynecological Services, informed Sylvester that she would fail her OB rotation for the second time. In a letter to Marshall on May 1, 2023, Provost outlined a series of significant concerns about Sylvester's performance. She explained that Sylvester "made disjointed patient presentations with rudimentary knowledge of gynecology," which was "unexpected because she rotated with us last year."[13] Provost further stated that Syvester's patient interactions were "fragmented" and that she was "not able to use previous discussions to create simple patient plans."[14] She added that another doctor, Dr. Nguyen, "had the same experience," and that Sylvester "appears to struggle to create comprehensive thoughts."[15] LSU's  "Clinical Competency Committee" then recommended that Sylvester be terminated from the LSU Health Sciences Center-Lafayette Family Residency Program, but she was offered the option of voluntarily resigning from the program.[16] Sylvester resigned from the program in June 2023.[17]

Sylvester contends that her performance problems and the discipline imposed by LSU stemmed from a consistent pattern of bullying and sexual harassment by her resident supervisors. Sylvester contends that  Dr. Tasia Bradley, a third-year resident in the program, bullied, demeaned, and publicly berated her throughout her residency. She alleges that Bradley told her at the beginning of the program that "you better get your act together."[18] According to Sylvester, "Bradley engaged in harassing behavior including standing close to [Sylvester's] face and body

---

[13] ECF No. 15-16.
[14] *Id.*
[15] *Id.*
[16] ECF 15-1 at 4.
[17] *Id.*
[18] ECF No. 1 at 2.

yelling aggressively at [her]," and that a supervisor told Bradley "bring it down some notches. That is unnecessary."[19] Sylvester further alleges that:

> Dr. Bradley would interrupt Dr. Kudji Sylvester as she was speaking in front of other residents or while presenting during the morning report. Dr. Bradley would speak in a disparaging manner and say things such as, "You don't know anything" or to other residents she would say, "Don't listen to her (meaning [Sylvester]), she doesn't know what she is talking about." These comments would often occur during rounds or evening sign-out which was disruptive and embarrassing.[20]

According to Sylvester, Bradley "made a point to loudly broadcast [Sylvester's] errors in front of others, and would often ask, 'How don't you know that?' rather than simply teaching [Sylvester]."[21] At one point, Sylvester alleges that Bradley told her that she "think[s] like a nurse."[22]

The summary judgment record includes evidence that Sylvester reported bullying by Bradley to LSU in February 2022. Specifically, a February 24, 2022, letter by Dr. Kristi Anderson, LSU Director of Graduate Education, detailed Sylvester's complaints about Bradley.[23] Anderson's letter also states that another program supervisor, Dr. Oge, asked Syvester about Bradley being hired as a resident "preceptor," and Sylvester responded, "I feel like I was raped working with the rapist."[24] In a follow up conversation, Sylvester explained that nothing happened to her physically and that her choice of words was to "describe how she felt."[25]

Sylvester also alleges that Dr. Jimmy Skrasek (a supervising resident) sexually harassed her on one occasion. According to Sylvester:

---

[19] ECF No. 1 at 2-3.
[20] *Id*. at 3.
[21] *Id*.
[22] *Id*. at 4.
[23] ECF No. 15-11.
[24] *Id*.
[25] *Id*.

> At the beginning of Plaintiff's second year of residency [in 2021], Dr. Jimmy Skrasek came up from behind the Plaintiff while at the clinic and whispered into her right ear, "You know you want this. You know you like this." Plaintiff immediately said "NO! NO, I don't! I am married!" Dr. Skrasek went back to his desk and Plaintiff sat there frozen in disbelief at what had just occurred. She immediately stood up and walked to the bathroom where she cried.[26]

While this incident occurred in 2021, Sylvester did not report the incident until early 2023.[27]

After her resignation, Sylvester filed the present action asserting claims under Title VII for discrimination and retaliation on the basis of sex. LSU subsequently filed the instant Motion seeking dismissal of Sylvester's claims.

## II.
### SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, discovery materials on file, and affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment is to pierce the pleadings, to assess the proof, and to determine whether there is a genuine need for trial.[28] Summary judgment procedure is designed to isolate and dispose of factually unsupported claims or defenses.[29] If the movant bears the burden of persuasion at trial on a claim or defense addressed in the motion for summary judgment, the movant must establish that there is no genuine dispute of material fact as to those claims or defenses. To satisfy this burden, the movant must come forward with competent summary judgment evidence conclusively establishing that no reasonable trier of fact could find other than for the moving party.[30] To avoid summary judgment, the non-

---

[26] ECF No. 1 at 5.
[27] ECF No. 15-1 at 4.
[28] *See Matsushita Elec. Indus. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986).
[29] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).
[30] *See Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986).

movant must then come forward with evidence showing that there is a genuine dispute of material fact.

If the non-moving party has the burden of persuasion at trial with respect to an issue addressed in the motion for summary judgment, the moving party may satisfy its initial burden by either (1) demonstrating affirmatively that there is no triable issue of fact as to each element of the non-moving party's affirmative defenses or claims, or (2) showing that the non-moving party cannot present evidence sufficient to satisfy the essential elements of its defenses or claims, and thus cannot meet its burden of persuasion at trial.[31] If the moving party makes a showing that there is "no evidence" to support the non-moving party's claims or defenses, the non-moving party must come forward with "substantial" evidence showing a genuine dispute of material fact with respect to each essential element of its affirmative defenses or claims.[32] Substantial evidence for purposes of defeating summary judgment is evidence that is sufficient to support a jury verdict in the non-movant's favor.[33] Under this standard, the non-movant cannot rely on unsupported assertions or arguments but must submit sufficiently probative evidence supporting its claims or defenses. Even if the burden shifts to the non-moving party, the movant still retains the ultimate burden of persuasion on the motion for summary judgment.[34]

In considering a summary judgment motion, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party

---

[31] *Celotex Corp.*, 477 U.S. at 324–326.
[32] *Id.*
[33] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–252 (1986).
[34] *Celotex Corp.*, 477 U.S. at 330–331.

that is uncontradicted and unimpeached."[35] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[36]

### III.
### DISCUSSION

#### A. Disparate Treatment.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex."[37] An employer's action will be found unlawful if the employee can demonstrate that sex was a "motivating factor" for his or her termination, even if the employer was also motivated by other lawful factors.[38] A plaintiff can prove a claim of unlawful discrimination by either direct or circumstantial evidence. Cases built on the latter, such as this one, are analyzed under the framework set forth in *McDonnell Douglas Corp v. Green*.[39] The *McDonnel Douglas* framework requires Sylvester to first establish a prima facie case of discrimination by showing: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she was discharged or subject to an adverse employment action by her employer; and (4) she was replaced by someone outside her protected class or was treated less favorably than other similarly situated employees outside of the protected group.[40] If Sylvester satisfies her prima facie burden, the burden then shifts

---

[35] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001); *see also Feist v. Louisiana, Dept. of Justice, Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)(court must view all facts and evidence in the light most favorable to the non-moving party). "Credibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

[36] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex*, 477 U.S. at 322).

[37] 42 U.S.C. § 2000e–2(a).

[38] *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (citing 42 U.S.C. § 2000e-2(m)).

[39] 411 U.S. 792 (1973); *see also McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

[40] *McCoy* at 556; *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir.2001).

to LSU to articulate a legitimate, nondiscriminatory reason for its employment action.[41] An employer's burden is only one of production, not persuasion, and involves no credibility assessment.[42] If an employer meets this burden, the presumption of discrimination disappears, and the plaintiff must then either: (1) offer sufficient evidence to create a genuine issue of material fact that the employer's proffered reason is not true, but instead is a pretext for a discriminatory purpose (the pretext alternative), or (2) demonstrate defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (the mixed-motive alternative).[43]

LSU argues that Sylvester cannot show that she was replaced with someone outside her protected class or that others similarly situated to her were treated more favorably under nearly identical circumstances. The Court agrees. There is no evidence in the summary judgment record that Sylvester was replaced by another person outside her protected group; nor is there evidence in the record that she was treated less favorably than other similarly situated employees outside of her protected group.[44] The summary judgment record shows that Sylvester was repeatedly cited for performance problems during the second year of her residency program and was disciplined and allowed to resign as a result of those performance problems. Sylvester points to nothing in the summary judgment record showing that similarly situated men—men with a similar record of performance problems—were treated more favorably. Because Sylvester cannot show either that she "was replaced by someone outside the protected class, or that other similarly situated persons

---

[41] *McCoy* at 557.

[42] *Id.*

[43] *McCoy*, 492 F.3d at 557; *Vaughn*, 665 F.3d at 636; *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

[44] *Wallace v. Methodist Hosp. System*, 271 F.3d 212 (5th Cir. 2001); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995); *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991); *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990).

were treated more favorably," she cannot establish her prima facie case for disparate treatment sex discrimination.

Sylvester, however, points to allegedly gender-based statements made by Dr. Tasia Bradley—that Sylvester was thinking "like a nurse" and dismissing Sylvester with "don't listen to *her*"—and contends that these statements provide direct evidence of discriminatory intent.[45] According to Sylvester, "references to a female dominated profession that assists physicians as shorthand for incompetence" reflects "gender stereotyping."[46] These stray comments standing alone cannot give rise to an inference of discriminatory intent. The summary judgment record reflects allegations of Sylvester's poor performance and lack of professional skills throughout her residency. For example, Dr. Frank Caillet, a member of the OB faculty, observed in 2021 that Sylvester "lacks basic knowledge in managing obstetric patients on an inpatient service, among other noted deficiencies."[47] LSU also points to evidence in the summary judgment record that Sylvester was "below peer average performance in 28 of 28 areas of competency in her second year" of residency.[48] In this context, Bradley's statements are not denigrating nurses as a class— or as a "female dominated profession that assists physicians as shorthand for incompetence"—but instead likely reflects concern that Sylvester was not exhibiting the skills required for a ob-gyn doctor responsible for managing nurses and in-patient care. The same analysis applies to the "don't listen to her" comment.[49] Given that Sylvester has not pointed to any other facts that would show

---

[45] ECF No. 23 at 6.

[46] *Id.* at 18.

[47] ECF No. 15-1 at 2.

[48] *Id.* at 1.

[49] *See, e.g.*, *Moreno v. Dealer Integrated Servs., L.L.C.*, 25-20470, 2026 WL 1286835, at *2 (5th Cir. May 11, 2026) (Noting the Court had previously declined to credit as direct evidence a remark by the plaintiff's direct supervisor that "I don't know how to classify you because you were gone three months and now you'll be gone three months again," because the supervisor's statement could only be linked to the plaintiff's pregnancy if the court inferred that the reference to leave was "code language," and the Court declined to infer as much.) (citing *Wallace*, 271 F.3d at 222-23).

that the statements reflect gender bias, Bradley's comments cannot support a disparate treatment gender discrimination claim. Accordingly, the Court GRANTS the Motion for Summary Judgment with respect to Sylvester's disparate treatment claim. That claim is dismissed with prejudice.

### B. Hostile Work Environment.

LSU next challenges Sylvester's sexual harassment and hostile work environment claims. These claims appear to be based on Sylvester's allegations of bullying and harassing conduct by a supervising resident, Dr. Tasia Bradley, and an alleged sexual proposition by a male supervisor, Dr. Jimmie Skrasek. Sexual harassment is a form of prohibited sex discrimination under Title VII, and encompasses quid pro quo harassment and harassment that creates a hostile work environment.[50] An employee asserting a quid pro quo harassment claim must prove that they suffered a "tangible employment action" resulting from the "acceptance or rejection of [a] supervisor's alleged sexual harassment."[51] A workplace is sufficiently hostile as to violate Title VII when it "is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[52]

Sylvester has not pointed to any evidence in the summary judgment record that would allow a reasonable juror to find quid pro quo harassment with respect to Bradley or Skrasek. Sylvester's documented performance problems began before her alleged encounter with Skrasek and extended until her resignation two years later. While Skrasek authored one of Sylvester's poor evaluations, Sylvester received poor performance evaluations from other doctors.[53] Sylvester's

---

[50] *Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 675-76 (5th Cir. 2021) (citations omitted).

[51] *Id.*

[52] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)) (internal citations omitted); *see also Reed v. Neopost USA, Inc.*, 701 F.3d 434, 443 (5th Cir. 2012).

[53] *See, e.g.*, ECF Nos. 15-5, 15-6, 15-8, 15-9, 15-10, 15-13, and 15-16.

allegations, and the evidence supporting the allegations, simply do not show a tangible employment action *resulting from* that alleged brief encounter with Skrasek. For the same reasons, Sylvester's allegations with respect to Bradley do not give rise to a quid pro quo claim—Sylvester points to no evidence that Sylvester accepted or rejected any incident of sexual harassment by Bradley.

The Court turns now to the hostile work environment claim. To recover on a hostile work environment claim, Sylvester must prove that: "(1) [she] belongs to a protected group; (2) [she] was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of [her] employment; and (5) [her] employer knew or should have known of the harassment and failed to take prompt remedial action."[54] Sexual harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[55] The conduct complained of "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."[56] Whether the alleged conduct creates a hostile or abusive work environment "requires a careful consideration of the social context in which particular behavior occurs and is experienced by its target."[57] This inquiry must also

---

[54] *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).

[55] *Boh Bros.*, 731 F.3d at 453 (citing *Aryain v. Wal–Mart Stores of Tex., L.P.*, 534 F.3d 473, 479 (5th Cir. 2008)). There is some confusion in the Fifth Circuit's case law on the "pervasive or serious" standard. Some Fifth Circuit panel opinions—and lower district court cases following those opinions—suggest that the standard is *conjunctive* in that the plaintiff must show that the relevant conduct is "pervasive *and* serious." *See Shepherd v. Comptroller of Public Accounts*, 168 F. 3d 871, 874 (5th Cir. 1999); *Hoskman v. Westward Communications*, 407 F.3d 317, 326 (5th Cir. 2001). In *Harvill v. Westward Communications, L.L.C.*, a Fifth Circuit panel observed that this formulation is erroneous because, under Supreme Court precedent, the standard is *disjunctive*. 433 F.3d 428, 435 (5th Cir. 2005). In other words, conduct can satisfy the standard for a hostile environment claim if it is pervasive *or* if it is isolated but "extremely serious." *Id.*

[56] *Harvill* at 434 (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.1999)).

[57] *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).

consider the totality of the circumstances, including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance."[58]

The Court begins with the conduct attributed to Bradley, Sylvester's supervising resident. Sylvester alleges that she "experienced repeated gender-based bullying, intimidation, and humiliating treatment from Dr. Tasia Bradley in words and conduct," and that this "conduct included public criticism and demeaning interactions in the clinical setting."[59] She alleges that Bradley's behavior included "standing close to [Sylvester's] face and body yelling aggressively."[60] Sylvester also cites Bradley's statement that Sylvester was thinking like a nurse. The "social context" in which this behavior occurred is a hospital training young doctors to make medical decisions and manage patient care. Taking the totality of the actions and words attributed to Bradley as true, Sylvester has shown that Bradley may have been a harsh, demanding boss who created a difficult—maybe even a bullying—work environment. But that showing alone is not sufficient to prove a *gender-based* hostile work environment claim under Title VII because the evidence does not show that Bradley's actions were based on gender as opposed to Sylvester's work performance.[61] The offensive conduct must go beyond "[t]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."[62] Criticism of an employee's work performance and close monitoring of job performance

---

[58] *West v. City of Houston, Texas*, 960 F.3d 736, 742 (5th Cir. 2020); *Harvill*, 433 F.3d at 435.
[59] ECF No. 23 at 1.
[60] ECF No. 1 at 19.
[61] *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 617–18 (5th Cir. 2020) (affirming summary judgment where there was no evidence that workplace bullying was motivated by the plaintiff's gender).
[62] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

generally do not amount to a hostile work environment.[63] Similarly, "heightened scrutiny of an employee by a supervisor" generally cannot "support a hostile work environment claim."[64] In the end, the alleged conduct must be gender-based for Sylvester to prove her claim, and she has not created a triable issue in that regard.

On the other hand, the conduct attributed to Skrasek could amount to gender-based harassment. But Sylvester cites only this single instance of conduct by Skrasek and points to no evidence of similar interactions with Skrasek or others. Isolated incidents of harassment may violate workplace policies and rules (and may even lead to discipline by an employer) but generally will not support a hostile work environment claim under Title VII unless they are "extremely serious."[65] Here, the encounter with Skrasek was brief, involved no physical contact, and was not repeated (at least Sylvester does not allege that it was repeated). Cases where courts have found triable issues with respect to the severity or pervasiveness of harassment generally involve cases of more extensive and recurrent harassment over a period of time. For example, in *Harvill*, the plaintiff alleged a pattern of harassment that lasted over seven months.[66] During this seven-month period, the plaintiff alleged that her supervisor:

> [G]rabbed her and kissed her on the cheek, popped rubber bands at her breasts, fondled her breasts "numerous times," patted her on her buttocks "numerous times," and came behind her and rubbed his body against her. At one point, Harvill estimated that Rogers touched her breasts or her buttocks perhaps as often as once a week—although she later stated that it may not have been as often as once a week. She also claims that on one occasion Rogers made comments to her about her sex

---

[63] *Gonzales v. Wells Fargo Bank, Nat'l Ass'n*, 733 F.App'x 795, 798 (5th Cir. 2018) ("'[C]areful monitoring of job performance[ ]' . . . does not rise to the level of hostile work environment harassment."); *Credeur v. La. Through Off. of Att'y Gen.*, 860 F.3d 785, 796 (5th Cir. 2017) ("Criticism of an employee's work performance . . . and even threats of termination do not satisfy the standard for a harassment claim.").

[64] *Robinson v. Paulson*, No. CIV.A. H-06-4083, 2008 WL 4692392, at *18 (S.D. Tex. Oct. 22, 2008) (collecting cases).

[65] *Ivey v. Brennan*, 770 F.App'x 661, 665 (5th Cir. 2019) (citing *Faragher*, 524 U.S. at 788); *see also Harvill*, 433 F.3d at 435 (citing *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001)).

[66] 433 F.3d at 435.

life and her abilities in bed. Harvill stated that she protested *every time* Rogers touched her breasts and she also protested when Rogers would pat her buttocks."[67]

Similarly, in *La Day v. Catalyst Technology, Inc.*, the plaintiff grounded his hostile work environment claim on multiple, frequent instances of harassment:

> In the first incident, Craft observed La Day sitting in a car with La Day's girlfriend and saw "passion marks" on La Day's neck. According to La Day and his girlfriend, Craft approached them and stated, "I see you got a girl. You know I'm jealous."
>
> On a later date, La Day alleges that Craft approached him from behind while he was bending down and fondled his anus. La Day described the contact as similar to "foreplay with a woman." La Day turned around immediately and told Craft not to touch him that way because "I don't play like that." Craft laughed and walked away. That same day, La Day reported the incident to his immediate supervisor. Later that day, Craft allegedly spit tobacco on La Day's hard hat and shirt, stating "this is what I think of you."[68]

While a single instance of harassment can support a hostile work environment claim, the conduct must be "extremely serious." In *Paul v. Northrop Grumman Ship Sys.*,[69] the court ruled that the relevant conduct was not so severe or pervasive that it created a hostile work environment. There, the plaintiff alleged that a co-worker:

> walked up to her until his chest was touching hers, thus "chesting up" to her breasts in a thirty-second confrontation. As Paul [the plaintiff] attempted to separate herself, he stared at her in a hostile and intimidating manner. Paul then walked away toward a narrow ship passageway, but Barattini followed her. He forced his way through the door ahead of her, and, in doing so, placed his hand on her stomach and ran his arm around her waist. As he squeezed past her in the passageway, he allegedly "rubbed his pelvic region across [her] hips and buttocks." According to Paul, the incident lasted a total of approximately a minute and a half, and occurred in the presence of another supervisor who did not intervene.[70]

---

[67] *Id*. at 435-36.

[68] 302 F.3d 474, 476 (5th Cir. 2002); *see also Hartfield v. Pizza Inn, Inc.*, No. 02-0097, 2002 WL 31056595 at *3-4 (E.D. La. Sept. 13, 2002) (observing that sexual hostile environment cases decided by the Supreme Court have generally "involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiff's work environment.") (collecting cases).

[69] 309 F.App'x 825 (5th Cir. 2009).

[70] *Id.* at 826.

Here, the conduct alleged is less severe than the conduct at issue in *Paul*. Thus, it does not rise to the "extremely serious" level required to maintain a claim of hostile work environment based on an isolated incident.

In sum, the summary judgment record does not support a triable issue on Sylvester's hostile work environment claims. Accordingly, LSU's Motion for Summary Judgment is GRANTED with respect to this claim, which is dismissed with prejudice.

## C. Retaliation.

Finally, LSU's Motion for Summary Judgment challenges Sylvester's retaliation claim. To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) [she] participated in an activity protected by Title VII; (2) [her] employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action."[71] If the plaintiff demonstrates a prima facie case of retaliation, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action …[i]f the employer does so, the burden shifts back to the plaintiff to prove that the proffered reason is pretext for the discriminatory or retaliatory purpose."[72] A plaintiff must rebut "each nondiscriminatory or nonretaliatory reason articulated by the employer."[73]

Syvester's allegations and the summary judgment record create triable issues as to each element of Sylvester's prima facie case. Specifically, she cites evidence that she filed complaints against Bradley, Skrasek, and other residents based on alleged gender based discriminatory conduct, which constitutes engaging in protected activity. The Fifth Circuit has made clear that the

---

[71] *Newbury*, 991 F.3d at 678 (citing *McCoy*, 492 F.3d at 556–57).
[72] *Id.*
[73] *Id.*

standard is not whether the plaintiff can successfully state and support a Title VII claim but whether the plaintiff "*reasonably believes* the employment practice to be unlawful."[74] This "reasonable belief" standard acknowledges that there is "some zone of conduct that falls short of an actual violation but could be reasonably perceived to violate Title VII."[75] Sylvester also points to evidence that LSU took adverse action against her. As far as causation, Sylvester alleges that at the time she reported Skrasek's actions, her performance had improved and she had been removed from probation. The summary judgment record shows that, after Sylvester's complaint against Skrasek, LSU reported additional performance problems in the spring of 2023, informed her that she would fail her rotation, and ultimately recommended her termination from the residence program.

LSU does not expressly challenge Sylvester's prima facie case for Title VII retaliation but instead points to evidence of a "nondiscriminatory or nonretaliatory reason" for the adverse action taken against Sylvester. However, given the timing of the Title IX claim against Skrasek, Sylvester's allegation that her performance had improved at the time of her complaint, and the ultimate determination by LSU to terminate her from the program, the Court concludes that there are triable issues with respect to Sylvester's Title VII retaliation claim. Accordingly, LSU's Motion for Summary Judgment is DENIED with respect to this claim.

## IV.
### CONCLUSION

For the foregoing reasons, LSU's Motion for Summary Judgment [ECF No. 15] is GRANTED in part and DENIED in part. With respect to Sylvester's claims for disparate treatment, gender discrimination, and hostile work environment under Title VII, the motion is GRANTED

---

[74] *E.E.O.C v. Rite Way Serv., Inc.*, 819 F.3d 235, 240 (5th Cir. 2016) (emphasis added) (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1136 (5th Cir. 1981).
[75] *Id.* at 241.

and those claims are DISMISSED WITH PREJUDICE. With respect to Sylvester's Title VII retaliation claim, the motion is DENIED.

THUS DONE in Chambers on this 18th day of May, 2026.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**